# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **SHIRLEY A. JOHNSON,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 13-CV-288-GKF-PJC** |
| ) | |
| **CAROLYN W. COLVIN,** ) | |
| **Acting Commissioner of the** ) | |
| **Social Security Administration,** ) | |
| ) | |
| **Defendant.** ) | |

## REPORT AND RECOMMENDATION

Claimant, Shirley A. Johnson ("Johnson"), pursuant to 42 U.S.C. § 405(g), requests

judicial review of the decision of the Commissioner of the Social Security Administration

("Commissioner") denying Johnson's applications for disability benefits under Title XVI of the

Social Security Act, 42 U.S.C. §§ 401 *et seq.* Johnson appeals the decision of the Administrative

Law Judge ("ALJ") and asserts that the Commissioner erred because the ALJ incorrectly

determined that she was not disabled. This case has been referred to the undersigned. For the

reasons discussed below, the undersigned recommends that the Commissioner's decision be

**AFFIRMED.**

## Claimant's Background

At the hearing before the ALJ on April 3, 2012, Johnson was 51 years old. (R. 173, 177).

She and her husband rented a home and their adult son and daughter lived with them. (R. 178).

Johnson had completed the tenth grade and stated that she had taken learning disabled math

classes. (R. 179). She could read and understand a newspaper and could make change on

purchases at the grocery store.  *Id.*  At one time, she was a certified nurse's aid, but it had expired and she had no other education or training.  (R. 179, 181.).

Johnson reported that the last time she worked was in July of 2009, folding linen and laundry for a hotel.  (R. 180).  She testified that one day at work, her head started hurting and her nose began to bleed.  *Id.*  Johnson left work even though her supervisor told her that if she left, she would be out of a job.  *Id.*  She had also worked as a cashier, and as a motel housekeeper.  (R. 181).

When asked what conditions prevented her from going back to work, Johnson referred to problems with the middle part of her back, her right arm, and her right leg.  (R. 182-83).  With regard to her back, Johnson stated that her back hurt and ached all of the time.  (R. 191).  She indicated that the level of pain would go up and down.  (R. 192).  Johnson stated that her doctors had not told her the reason for the back pain, but had just instructed her to continue taking pain medication.  *Id.*  Johnson had not had surgery on her back.  *Id.*  She could bend down and touch her knees, but could not touch her toes.  *Id.*  Johnson asserted that she could not squat and come back up, and that if she tried, it would take a long time and she would probably fall over.  (R. 192-93).

Regarding her hands and wrists, Johnson stated that her right wrist hurt constantly.  (R. 186).  She stated that her doctor told her that she might have carpal tunnel syndrome.  *Id.*  She did not wear a splint.  *Id.*  When asked by the ALJ if she would have trouble picking up small items such as poker chips with her thumb and fingers, Johnson indicated that she might have trouble picking them up, but that she would probably be able to feel the chips.  (R. 187-88).  Johnson did not have any problems with her left hand.  (R. 187).

Johnson stated that her right arm was in constant pain.  (R. 188).  She stated that she did not know why it hurt, but that it might be because she had broken it twice.  *Id.*  Johnson had trouble reaching with her right arm.  *Id.*  She indicated that she lacked grip strength in her right hand and she would be able to reach above her head and change a lightbulb with her left hand, but not with her right hand.  (R. 189, 201).  When asked if she washed her hair with her right hand, Johnson replied that she never washed her hair because her daughter did that for her, though she could brush her hair with the right hand.  (R. 189).

Regarding her right leg, Johnson indicated that her knee would often swell up.  (R. 190).  She thought that her right knee might have excess fluid in it.  *Id.*  Johnson stated that her right knee hurt all the time.  *Id.*  She had not had surgery on it, nor had her doctors recommended surgery.  *Id.*  Johnson reported that she usually kept a wrap on her knee and used a walker every now and then.  (R. 190-91).  Johnson did not drive, but instead would take the bus or have her husband drive her.  (R. 191).  When asked if the weather affected her in any way, Johnson replied that cold weather caused her whole body to ache.  *Id.*

Johnson also indicated that she was taking medication for high blood pressure.  (R. 183).  Johnson reported suffering vision problems and using reading glasses.  (R. 184).  She needed regular glasses as well, but lacked the money to purchase them.  *Id.*

Johnson also admitted to suffering from bladder problems.  *Id.*  She used the bathroom seven or eight times per night.  *Id.*  She did not wear protective undergarments.  (R. 185).  Additionally, Johnson suffered from hearing problems, and stated that she was often unable to understand people when they were talking to her.  *Id.*  She had trouble hearing people on the telephone, and used a special phone that amplified the volume.  *Id.*

Johnson also stated that she suffered from constant headaches. (R. 189). The only thing that relieved her headaches was lying down in a quiet room and taking Lortab or Excedrin. *Id.* Johnson reported that her doctors had not informed her why she was having headaches, but had simply told her that she had high blood pressure. (R. 190). When the headaches occurred, Johnson experienced problems with noise and could not handle light. *Id.* She stated that her severe headaches occurred every other day, usually lasting for 15 to 20 minutes, but sometimes for hours. (R. 201).

Additionally, Johnson complained of intermittent chest pain. *Id.* She stated that her doctor told her to stop smoking cigarettes; however, she continued to smoke. *Id.* Johnson did not believe that her condition was symptomatic of a heart problem, but was simply indicative of chest pain. (R. 199-200). She stated that she had received some heart pills from the hospital. (R. 200).

Johnson reported feeling depressed and anxious. *Id.* She was not on medication for those conditions and did not know why she was not taking medication. *Id.* She had never been hospitalized for those conditions and had not seen anyone for counseling. *Id.* When asked how those conditions were affecting her abilities, Johnson stated that depression kept her from doing things. (R. 195). She reported being forgetful and forgetting why she went into a room. *Id.* She admitted that she would sometimes put food on the stove to cook for dinner, and would then walk away and forget about it. *Id.* Johnson did not have trouble getting along with people. (R. 196). Johnson also admitted to "seeing things" frequently. (R. 201). She indicated that she would see something, but when she turned around, it was not there. *Id.* Johnson also stated that she sometimes heard a baby crying, but it was just in her head. *Id.*

Johnson stated that she had good days and bad days.  (R. 202).  On a bad day, she would just stay in her room with the door closed, the TV volume on low, and the phone off.  *Id.*  Johnson reported having bad days three times every month.  *Id.*

Johnson disliked having to walk down a flight of stairs because it would take her a long time; she would become short of breath, and she would experience pain.  (R. 193).  She indicated that her doctors had told her not to lift over 10-15 pounds.  *Id.*  She stated she could sit for 30-40 minutes before needing to stand up.  *Id.*  She could stand for 10-15 minutes before needing to sit down again.  *Id.*  Johnson stated that she could walk a block, but would need to stop and take her time because her legs would hurt and cramp.  (R. 194).

When asked if any of her medications caused side effects or allergic reactions, Johnson replied in the affirmative, stating that her prescriptions caused her body to feel "funny."  (R. 196).  She denied doing anything to relieve her symptoms besides taking medication.  *Id.*

Johnson also indicated experiencing a reduced appetite but gaining 10 pounds in the previous six months.  *Id.*  She experienced trouble falling asleep.  (R. 198-99).  For example, she would go to bed at 10:30 PM, but would be unable to fall asleep until 2:00 AM.  *Id.*  Racing thoughts prevented Johnson from falling asleep.  (R. 199).  On an average night, Johnson slept seven hours.  *Id.*  She did not nap during the day.  *Id.*

Johnson reported that she occasionally did the dishes.  (R. 196).  She spent most of her time in her room watching television.  *Id.*  She no longer dusted furniture, but she mopped the bathroom floor, vacuumed the carpets, and made her bed.  *Id.*  Johnson also did laundry, some cooking, and some shopping.  (R. 197).  Her grandchildren would come over for visits, but they were her only social visitors.  *Id.*  Johnson reported that she would go to church occasionally.  *Id.*

Besides church attendance, Johnson did not take part in any other social activities and did not participate in any sports or hobbies.  (R. 198).  She did not do any gardening or yard work.  *Id.*

## Medical Evidence of Record

Records reflect that on April 2, 2009, Johnson was transported by ambulance to the Emergency Department at Hillcrest Medical Center ("Hillcrest") following an automobile accident.  (R. 96-111).  Johnson had been traveling in the passenger seat of a vehicle when it was struck in the rear by a bus.  (R. 105).  Johnson complained of head, neck, and back pain, but denied loss of consciousness.  (R. 97, 105).  She was able to move her head side to side and up and down.  (R. 105).  Johnson exhibited no neurological deficits, numbness, or tingling.  *Id.*  An x-ray only depicted degenerative change at the C5-C6 disc level.  (R. 104).  Cervical alignment was anatomic, and there was no acute fracture or dislocation identified.  *Id.*  There was no evidence of soft tissue swelling or bony abnormality.  *Id.*  The attending physician diagnosed Johnson with acute cervical strain and prescribed Motrin.  (R. 98).

On July 29, 2010, Johnson was seen at Hillcrest for complaints of a sore throat, fever, and cough.  (R. 113-118).  She was diagnosed with tonsilitis/pharyngitis, given an injection of dexamethasone,[1] and discharged home.  *Id.*

On May 11, 2011, Johnson presented to the Emergency Department at Oklahoma State University Medical Center ("OSU-MC"), complaining of a headache and back pain.  (R. 166).  Johnson explained that she had suffered from intermittent head and low back pain for the past three or four months.  *Id.*  She stated that her headache began suddenly and had been worse for the past two weeks.  *Id.*  The headache was located over her frontal area.  *Id.*  Johnson denied

---

[1] Dexamethasone is often used as an anti-inflammatory.  *www.pdr.net*.

any palliative or provocative factors and rated her symptoms as a 9/10 in severity. *Id.* Johnson's vertebral column was examined, and the physician noted bilateral paraspinal tissue associated with hypertonicity.[2] (R. 167). Johnson exhibited no tenderness to palpitation or percussion, and there was no indication of spinal abscess. *Id.*

Johnson was diagnosed with Cephalgia,[3] lumbar strain, and hypertension. *Id.* She was discharged with a prescription for Compazine[4] as well as Benadryl for her headaches. *Id.* An MRI was scheduled. *Id.* With regard to Johnson's ongoing hypertension, she was prescribed Hydrochlorothiazide.[5] *Id.* Johnson was instructed to follow up in 2-3 days and to return for any problems, concerns, or changes in her condition. *Id.*

On August 10, 2011, Johnson presented to the Emergency Department of OSU-MC, complaining of back pain. (R. 160). Johnson reported that she had suffered from lower back pain intermittently for the previous two months. *Id.* Johnson rated the pain as a 9/10 in severity, and stated that the pain had worsened after falling in the bathtub two days earlier. *Id.* Johnson described the pain as sharp and non-radiating, with no alleviating or aggravating factors. *Id.* She denied numbness, tingling, weakness, or paralysis. *Id.* Johnson also admitted to suffering from urinary frequency and dysuria.[6] *Id.* The attending physician noted bilateral paraspinal

---

[2] Hypertonicity (hypertonia) is a condition of excessive tone of the skeletal muscles and increased resistance of muscle to passive stretching. DORLAND'S ILLUSTRATED MEDICAL DICTIONARY 859 (29th ed. 2000) (hereinafter, "DORLAND'S").

[3] Cephalgia is a medical term for headache. DORLAND'S at 321.

[4] Compazine (Prochlorperazine) treats anxiety. *www.pdr.net.*

[5] Hydrochlorothiazide is a medication that treats hypertension. *www.pdr.net.*

[6] Dysuria is painful or difficult urination. DORLAND'S at 560.

muscle tenderness of Johnson's thoracolumbar spine.  (R. 161).  A urinalysis was obtained, which came back negative.  *Id.*  Johnson was diagnosed with lumbar pain and prescribed pain medication.  *Id.*  She was instructed to follow up with the Clinic and to return for worsening of symptoms or neurological changes.  *Id.*

On August 23, 2011, Johnson presented to the Emergency Department at OSU-MC complaining of chest pain.  (R. 150).  Johnson characterized the pain as mid-sternal and indicated that it did not radiate.  *Id.*  She rated the pain a 10/10 and stated that it hurt to breathe.  *Id.*  A chest x-ray showed a normal cardiac silhouette, no infiltrates, and no free air.  (R. 151).  EKG readings were within normal limits.  *Id.*  A radiographic evaluation of the chest was unremarkable.  (R. 158).

The attending physician diagnosed Johnson with poorly controlled hypertension and chest pain.  (R. 151).  Johnson was provided aspirin and nitrogen, and she subsequently indicated that she was pain-free.  *Id.*  The physician wanted Johnson to be admitted for cardiac admission.  *Id.*  However, Johnson declined admission, stating that she merely wanted to obtain medication for her blood pressure and to follow up on an outpatient basis.  *Id.*  Johnson was discharged with Hydrochlorothiazide and instructed to follow up with her primary care physician.  *Id.*

On May 18, 2012, after the administrative hearing, Margaret A. Stripling, D.O.,[7] completed a "Residual Functional Capacity to do Work Related Activities" form.  (R. 92-95).  According to the form, Dr. Stripling opined that Johnson could only sit, stand, and walk for a total of 14 minutes in an 8-hour day.  (R. 92).  She noted that Johnson could not lift or carry

_____

[7] Portions of the form appear to have been completed by two different individuals as evidenced by different handwriting.  (R. 92-95).  The signature on the form is essentially illegible, but was produced in response to a subpoena to Dr. Stripling's office.  *Id.*

anything.  *Id.*  Johnson was restricted to never squatting, crawling, climbing, or reaching, and only occasional bending, handling, and fingering.  (R. 93).  It was noted that Johnson should be completely restricted from activities involving unprotected heights, moving machinery, exposure to dust/fumes/gas, driving, and vibrations.  *Id.*  Moderate restrictions to changes in temperature and humidity were also noted.  *Id*  In response to whether Johnson could work on a sustained and continuing basis, Dr. Stripling marked "No," noting Johnson's lack of concentration, anxiety, and shortness of breath.  (R. 93-94).  Dr. Stripling noted Johnson had moderate to severe pain on a daily basis and difficulty ambulating.  (R. 94).  In "support" of the above opinions, Dr. Stripling recommended x-rays and blood work to be scheduled and completed. (R. 95).

## Agency Examinations and Assessments

On October 23, 2010, Johnson was examined by agency consultant Erin Kratz, D.O.  (R. 120-29).  During the examination, Johnson reported suffering from pain in her back, legs, and arms for about four months.  (R. 121).  Johnson indicated that her pain began after she was involved in two automobile accidents.  *Id.*  Johnson described the pain as constant, sharp, and non-radiating, and rated it as a 7/10 in severity.  *Id.*  Movement caused her back pain to worsen, but sitting still made it better.  *Id.*  The pain in Johnson's arms was bilateral, but worse on the right.  *Id.*  Johnson described her arm pain as achy, burning, and a 7/10 in severity.  *Id.*  Dangling her arms caused the pain to worsen, but holding her arm in a flexed position lessened the pain. *Id.*

Johnson also reported bilateral leg pain, and stated that her leg pain caused her to fall straight to the floor after getting out of bed each morning.  *Id.*  The leg pain was located in her muscles, and Johnson described it as "achy" and a 9/10 in severity.  *Id.*  Nothing improved the

leg pain, and standing and walking caused the pain to worsen.  *Id.*  Johnson stated that she was

no longer able to drive or perform household chores due to her pain, but was able to bathe and

dress herself.  *Id.*  Johnson also described suffering from substantial, sharp, non-radiating chest

pain, which she rated a 9/10.  (R. 127).  Johnson indicated that her episodes of chest pain had

been occurring for the previous two months, occurring 3-4 times per day, and lasting 10-15

minutes.  *Id.*

During the examination, Dr. Kratz noted that Johnson's range of motion was limited to

100/150 degrees with regard to left and right shoulder abduction in supination.  (R. 124).  Left

and right shoulder elevation was also limited to 100/150 degrees.  *Id.*  All other range of motion

was within normal limits.  Dr. Kratz also noted pain with movement of Johnson's upper

extremities bilaterally.  (R. 122).  No cyanosis, claudication, or edema was noted.  *Id.*  Johnson

exhibited a significant tremor in her bilateral upper extremities when asked to demonstrate range

of motion, but exhibited no tremor at any other time.  *Id.*  Johnson's gait was stable with a slow

speed and a slight limp.  *Id.*  Dr. Kratz assessed Johnson with hypertension, anxiety, and chronic

back, leg, and arm pain.  *Id.*

On February 7, 2011, agency consultant Timothy Walker, M.D., completed a Residual

Functional Capacity Assessment of Johnson.  (R. 130-37).  Dr. Walker noted Johnson's primary

diagnosis was chronic back, leg, and arm pain, and the secondary diagnosis was hypertension.

(R. 130).  He indicated that Johnson could lift and/or carry 20 pounds occasionally and 10

pounds frequently.  (R. 131).  Dr. Walker also indicated that Johnson could stand and/or walk for

a total of about 6 hours in an 8-hour workday, or sit for a total of about 6 hours in an 8-hour

workday.  *Id.*  Johnson's ability to push and/or pull was determined to be unlimited.  *Id.*  Dr.

Walker imposed no postural, manipulative, visual, communicative, or environmental limitations. (R. 132-34).

Dr. Walker noted that he based his findings on Johnson's medical records from Hillcrest and Dr. Kratz's examination. (R. 131-32). Specifically, Dr. Walker noted that Johnson experienced pain and tremors with movement of upper extremities bilaterally, but also noted that she did not demonstrate tremors at any other time. (R. 131-32). Dr. Walker also pointed out that although Johnson's gait was stable with a slight limp during the exam, no abnormality was present when Johnson was observed ambulating in the parking lot. (R. 132). Further, Johnson did not require the use of assistive devices to ambulate. *Id.* Dr. Walker inaccurately noted that "[a]ll range of motion in both the upper and lower extremities [were] within normal limits," as Dr. Kratz had found a decreased range of motion in Johnson's shoulders. (R. 124, 131). Based on his review of the evidence, Dr. Walker concluded that the objective exams did not support Johnson's alleged limitations. (R. 132).

An additional Physical Residual Functional Capacity Assessment was completed by agency consultant Sharon Dodd, M.D., on April 13, 2011. (R. 138-45). Dr. Dodd found that Johnson was capable of lifting 50 pounds occasionally and 25 pounds frequently. (R. 139). Dr. Dodd indicated that Johnson could stand and/or walk with normal breaks for a total of about 6 hours in an 8-hour workday, and could sit with normal breaks for a total of about 6 hours in an 8-hour workday. *Id.* Johnson's ability to push and/or pull was described as unlimited. *Id.* Dr. Dodd imposed no postural, manipulative, communicative, or environmental limitations. (R. 140-42). Regarding visual limitations, Dr. Dodd noted that Johnson's near and far acuity were limited. (R. 141). Johnson lacked the ability to see detail, near or far, and was unable to read

very small print.  *Id.*  Dr. Dodd's conclusions were also based on a review of Johnson's medical records, as well Dr. Kratz's examination.  (R. 139-40, 145).

Dr. Dodd pointed out that Johnson had complained of difficulty sleeping, but she did not provide a reason why.  (R. 143).  Additionally, Johnson had no problems with personal care, and prepared sandwiches or frozen meals every other day, which took her an hour.  *Id.*  Johnson cleaned her house for 2.5 hours per day and claimed to need help with house cleaning, but did not clarify how much help or with what chores.  *Id.*  Johnson shopped every three months for 1.5 hours.  *Id.*  Dr. Dodd noted that Johnson reported difficulty bending, standing, walking, hearing, and seeing, but did not explain how those abilities were affected by her conditions.  *Id.*  Johnson did not answer the question of how far she could walk, and did not need an assistive device for walking.  *Id.*

Dr. Dodd reasoned that Johnson had full range of motion for her cervical and lumbar spine, although she had pain with range of motion of her lumbar spine and spasm in her lumbar spine.  (R. 145).  Johnson displayed no atrophy, and she had full range of motion for all four extremities except her shoulders.  *Id.*  Overall, Johnson exhibited no difficulty with personal care.  *Id.*  Limitations in Johnson's activities of daily living and her report that when she got out of bed she often fell straight to the floor because of leg pain were not supported by objective evidence.  *Id.*  Additionally, Johnson was not on any pain medication.  *Id.*  Further, Dr. Dodd concluded that Johnson's description of her chest pain sounded "atypical."  *Id.*  Dr. Dodd noted Johnson's primary diagnosis was degenerative disc disease of the cervical spine, and the secondary diagnosis was degenerative disc disease of the lumbar spine, as well as a diagnosis of hypertension.  (R. 138, 146).

## Procedural History

Johnson filed an application on August 31, 2010 for supplemental security income

benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 401 *et. seq.* (R. 15).

Johnson's claim was denied initially and upon reconsideration. *Id.* An administrative hearing

was held before ALJ Gene M. Kelly on April 3, 2012. (R. 171-212). By decision dated May 22,

2012, the ALJ found that Johnson was not disabled. (R. 15-25). On March 19, 2013, the

Appeals Council denied review of the ALJ's decision. (R. 3-6). Thus, the decision of the ALJ

represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981,

416.1481.

## Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment." 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Act only if his

"physical or mental impairment or impairments are of such severity that he is not only unable to

do his previous work but cannot, considering his age, education, and work experience, engage in

any other kind of substantial gainful work in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability

claim. 20 C.F.R. § 404.1520.[8] *See also Williams v. Bowen,* 844 F.2d 748, 750 (10th Cir. 1988)

---

[8] Step One requires the claimant to establish that he is not engaged in substantial gainful activity, as defined by 20 C.F.R. § 404.1510. Step Two requires that the claimant establish that he has a medically severe impairment or combination of impairments that significantly limit his ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). If the claimant is engaged in substantial gainful activity (Step One) or if the claimant's impairment is not medically severe (Step Two), disability benefits are denied. At Step Three, the claimant's impairment is compared with certain impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App.1 ("Listings"). A

(detailing steps). "If a determination can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750.

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). This Court's review is limited to two inquiries: first, whether the decision was supported by substantial evidence; and, second, whether the correct legal standards were applied. *Hamlin v. Barnhart,* 365 F.3d 1208, 1214 (10th Cir. 2004) (quotation omitted).

Substantial evidence is such evidence as a reasonable mind might accept as adequate to support a conclusion. *Id.* The court's review is based on the record taken as a whole, and the court will "meticulously examine the record in order to determine if the evidence supporting the agency's decision is substantial, taking 'into account whatever in the record fairly detracts from its weight.'" *Id., quoting Washington v. Shalala,* 37 F.3d 1437, 1439 (10th Cir. 1994). The court "may neither reweigh the evidence nor substitute" its discretion for that of the Commissioner. *Hamlin,* 365 F.3d at 1214 (quotation omitted).

**Decision of the Administrative Law Judge**

At Step One, the ALJ found that Johnson had not engaged in any substantial gainful activity since her alleged onset date of August 31, 2010. (R. 17). At Step Two, the ALJ found

---

claimant suffering from a listed impairment or impairments "medically equivalent" to a listed impairment is determined to be disabled without further inquiry. If not, the evaluation proceeds to Step Four, where the claimant must establish that he does not retain the residual functional capacity ("RFC") to perform his past relevant work. If the claimant's Step Four burden is met, the burden shifts to the Commissioner to establish at Step Five that work exists in significant numbers in the national economy which the claimant, taking into account his age, education, work experience, and RFC, can perform. *See Dikeman v. Halter,* 245 F.3d 1182, 1184 (10th Cir. 2001). Disability benefits are denied if the Commissioner shows that the impairment which precluded the performance of past relevant work does not preclude alternative work. 20 C.F.R. § 404.1520.

that Johnson had severe impairments of arthritis in the legs and arms, degenerative disc disease of the cervical spine, vision problems, incontinence, headache, arthritis in hands and wrists, trouble hearing, depression, and anxiety.  *Id.*  At Step Three, the ALJ found that Johnson's impairments, or combination of impairments, did not meet any Listing.  (R. 17-19).

The ALJ found that Johnson had the RFC to perform light work.  (R. 19).  He found that Johnson could lift and/or carry 20 pounds occasionally and 10 pounds frequently.  *Id.*  She could stand and/or walk 6 hours in an 8-hour workday, and could sit 6 hours in an 8-hour workday, all with normal breaks.  *Id.*  The ALJ found that Johnson could occasionally bend, stoop, squat, crouch, kneel, crawl, and perform limited climbing.  *Id.*  She could push/pull with the right upper extremity and operate foot controls with the right lower extremity.  *Id.*  Johnson could occasionally reach overhead with the right upper extremity and had slight limitation in fingering, feeling, and grip ("between frequent and constant").  *Id.*  The ALJ stated that the work environment must have low noise and low light.  *Id.*  Further, Johnson must avoid fine vision and not work with small details.  *Id.*  She must avoid cold and must have easy access to restrooms. *Id.*

The ALJ noted depression and anxiety, stating that Johnson's work must be simple, repetitive, and routine, attempting to limit stress and content.  *Id.*  She must be able to alter positions from standing to sitting at will.  *Id.*  The ALJ noted Johnson's mild to moderate chronic pain, but stated that she would be able to remain attentive and responsive in a work setting, and could carry out normal work assignments satisfactorily.  *Id.*  The ALJ further stated that assuming that Johnson took medication for pain relief, but that such medications did not preclude her from functioning at the proper level, Johnson would remain reasonably alert to

perform required functions presented by her work setting.  *Id.*

At Step Four, the ALJ determined that Johnson was not capable of performing any past relevant work.  (R. 23).  At Step Five, the ALJ found that there were jobs in significant numbers in the national economy that Johnson could perform, considering her age, education, work experience, and RFC.  *Id.*  Therefore, the ALJ found that Johnson was not disabled from her alleged onset date of August 31, 2010 through the date of his decision.  (R. 24).

### Review

Johnson makes two arguments on appeal.  First, she contends that the ALJ committed multiple errors in evaluating the opinion evidence of record.  Second, she argues that the Commissioner failed to sustain her burden at Step Five and that she is not capable of performing the jobs identified by the vocational expert ("VE"). Regarding the issues raised by Johnson, the undersigned finds that the ALJ's decision is supported by substantial evidence and complies with the legal requirements.  Therefore, the undersigned recommends the ALJ's decision be

**AFFIRMED**.

### Opinion Evidence

Regarding opinion evidence, generally the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a nonexamining consultant is given the least weight.  *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004).  The regulations of the Social Security Administration require that "[r]egardless of its source, we will evaluate every medical opinion we receive."  20 C.F.R. § 416.927(d); *see also* SSR 96-5p, 1996 WL 374183.  An ALJ must consider all opinion evidence and, if he rejects it, he must provide specific legitimate reasons for the rejection.  *Doyal v. Barnhart*, 331 F.3d 758, 763-64 (10th Cir.

2003); *Victory v. Barnhart*, 121 Fed. Appx. 819, 825 (10th Cir. 2005) (unpublished). If an ALJ's RFC determination conflicts with a medical opinion, then the ALJ must explain why the opinion was not adopted. *Sitsler v. Barnhart*, 182 Fed. Appx. 819, 823 (10th Cir. 2006) (unpublished), *citing* SSR 96-8p, 1996 WL 374184; *Ramirez v. Astrue*, 255 Fed. Appx. 327, 332-33 (10th Cir. 2007) (unpublished) (directing ALJ on remand to make specific findings explaining why he did not adopt opinions of consulting examiner).

Johnson's primary argument is that the ALJ failed to weigh the opinions of her treating physician, Dr. Stripling.[9] However, other than assertions made in briefing, there is no evidence that Dr. Stripling was a treating physician. The only records from Dr. Stripling consist of a single RFC form. (R. 91-95). As the Tenth Circuit has set forth:

> The treating [source]'s opinion is given particular weight because of his "unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations. . ." 20 C.F.R. § 416.927(d)(2). This requires a relationship of both duration and frequency. "The treating physician doctrine is based on the assumption that a medical professional *who has dealt with a claimant and his maladies over a long period of time* will have a deeper insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir.1994) (emphasis added). . .
>
> [An] opinion is therefore not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source. . . [T]he opinion of an examining [source] who only saw the

---

[9] Dr. Stripling's RFC form was submitted in response to a subpoena from the ALJ and was to be submitted by May 15, 2012. (R. 91). The form, dated May 18, 2012, was *signed* before the ALJ issued his decision on May 22, 2012, but it was not *submitted* to the agency until June 2, 2012, after the decision had been rendered. (R. 91-95). However, because the Appeals Council considered Dr. Stripling's report and made it a part of the record, the report is now part of the administrative record for this Court to consider when evaluating the ALJ's decision for substantial evidence. *Martinez v. Astrue*, 389 Fed. Appx. 866, 868-69 (10th Cir. 2010); *O'Dell v. Shalala*, 44 F.3d 855, 859 (10th Cir. 1994); *Blea v. Barnhart*, 466 F.3d 903, 908 (10th Cir. 2006).

> claimant once is not entitled to the sort of deferential treatment accorded to a treating physician's opinion. *Reid v. Chater*, 71 F.3d 372, 374 (10th Cir.1995) (emphasis added).

*Doyal v. Barnhart*, 331 F.3d 758, 162-63 (10th Cir. 2003). To be entitled to special weight as that of a "treating source," Dr. Stripling would have had to have "seen the claimant 'a number of times and long enough to have obtained a longitudinal picture of [the claimant's] impairment,' taking into consideration 'the treatment the source has provided' and 'the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.'" *Id*. at 163 (*quoting* 20 C.F.R. 416.927(d)(2)(i)-(ii)).

There is no indication anywhere in the record that Dr. Stripling treated Johnson either before or after the RFC form was completed. The RFC form was the *only* piece of evidence submitted in response to a subpoena for medical records from Dr. Stripling's office. (R. 91-95). When asked to cite to specific objective medical evidence, tests, or findings, Dr. Stripling simply referred to tests that *should* be done, and not to existing objective medical evidence that supported the opinions. (R. 95). Under these circumstances, the opinions of Dr. Stripling are not the type of longitudinal "treating source" opinions that are entitled to special weight. *Doyal*, 331 F.3d at 163. Accordingly, the undersigned finds no error in the ALJ's failure to discuss, consider, or weigh the opinions of Dr. Stripling.

Johnson also asserts error in the ALJ's weighing of the opinions of Dr. Walker and Dr. Dodd. The ALJ stated he gave "great weight" to Dr. Walker's opinion and "some consideration" to the opinion of Dr. Dodd. (R. 22). The ALJ explained that he gave more weight to Dr. Walker's opinion (the more restrictive of the two) than the opinion of Dr. Dodd because Dr. Dodd did not appear to take into consideration Johnson's subjective complaints. *Id*. The

opinions of those consultants were substantial evidence that the ALJ was entitled to rely upon. *See Flaherty*, 515 F.3d at 1071 (nonexamining consultant's opinion was an acceptable medical source which the ALJ was entitled to consider and which supported his RFC determination). The ALJ's explanation for granting less weight to the opinion of Dr. Dodd was sufficient, particularly in light of the fact that the ALJ's RFC contained restrictions greater than those found by Dr. Dodd. S*ee Doyal*, 331 F.3d 758, *Sitsler,* 182 Fed. Appx. 819.

Johnson complains that Dr. Walker's opinion is not based on substantial evidence and cannot be relied upon because he incorrectly noted that Dr. Statz's examination revealed normal range of motion in Johnson's shoulders, when in reality, some of her movement was limited bilaterally to 100/150. (R. 124, 131). The undersigned agrees it would have been better if the ALJ had addressed this inconsistency, but finds the argument unpersuasive. *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166-67 (10th Cir. 2012) ("common sense, not technical perfection, is [the] guide" and "we cannot insist on technical perfection"). Out of five shoulder exercises, only two reflected a decrease in range of motion. (R. 124). Dr. Johnson did note that Johnson had significant tremor during the range of motion testing and that she experienced pain. (R. 131-32). Thus, it is clear that he did not ignore evidence of shoulder impairment. In addition, Dr. Dodd, who did specifically note the 100/150 restrictions, still found Johnson to be capable of completing medium work. (R. 145). Especially considering the fact that the ALJ's RFC included more restrictions than both of these consultant's opinions, these opinions provide substantial evidence for the limitations included within the RFC. *See Flaherty*, 515 F.3d at 1071.

When evidence does not conflict with the ALJ's RFC determination, the ALJ has a

reduced burden for "express analysis." *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004). In *Howard*, the Tenth Circuit rejected the claimant's argument that the ALJ had not complied with his obligation to discuss the evidence. The court first found that the ALJ's discussion was adequate, but then, as a second point, found that "perhaps more importantly, in this case none of the record medical evidence conflicts with the ALJ's conclusion that claimant can perform light work. When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened." *Id.* Here, because the ALJ's RFC determination was consistent with, and actually more restrictive than either of the consultant's opinions, the need for the ALJ to discuss them was reduced.

The ALJ's discussion demonstrates that he fully considered the objective and opinion evidence of record. The undersigned finds that his analysis was adequate, given the totality of his decision. The ALJ thoroughly discussed the medical evidence of record and Johnson's testimony, and the ALJ assessed Johnson's credibility, which she does not contest. (R. 16-22). Inconsistency of complaints with objective medical evidence is a legitimate consideration. 20 C.F.R.§ 404.1529(c)(4). Thus, the ALJ's RFC determination was supported by substantial evidence, and it complied with legal standards.

**Step Five**

At Step Five, the burden shifts to the Commissioner to show that there are jobs in significant numbers that the claimant can perform taking into account his/her age, education, work experience and RFC. *Haddock v. Apfel*, 196 F.3d 1084, 1088-89 (10th Cir. 1999). The ALJ is allowed to do this through the testimony of a VE. *Id.* at 1089. In *Haddock*, the Tenth Circuit ruled that an ALJ must elicit testimony from a VE regarding whether the VE's testimony

conflicts with the DOT.  *Id.* at 1089-92.  If there is a conflict, the ALJ must investigate it and elicit a reasonable explanation for the conflict before he can rely on the testimony of the VE.  *Id.* at 1091-92.

Johnson essentially asserts that the VE's testimony conflicts with DOT job descriptions and contends that she is incapable of performing any of the three jobs identified by the VE. Specifically, she contends she cannot perform the job of table worker (WestLaw DICOT #739.687-182) because it is a sedentary job, and she would grid out.  She argues she cannot perform the job of bottling line attendant (WestLaw DICOT #920.687-042) because it requires frequent near acuity and depth perception, as well as a loud noise level.  Similarly, she argues she cannot perform the job of poultry eviscerator (WestLaw DICOT #525.687-074) because it requires significant and constant handling, constant reaching, constant near acuity, constant accomodation, constant atmospheric conditions, constant exposure to wetness and humidity, and moderate noise level.

The undersigned finds Johnson's argument pertaining to the sedentary table worker position without merit.  As pointed out by the Commissioner in her response, the ALJ found that Johnson had the maximum RFC for light work, not sedentary work, and the applicable Medical-Vocational Guidelines Johnson relies on in support of her argument are applicable only to individuals with a *maximum* work capability of sedentary work.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 201.00(a).  Johnson's maximum work capability was set by the ALJ as light work, which would not preclude her from performing a sedentary job and the ALJ is entitled to use and rely on both light and sedentary jobs at Step Five.  *See id.*, 20 C.F.R. § 416.967(b).

Johnson's other arguments focus extensively on her abilities to perform each of the

positions cited by the ALJ in his decision.  As this Court has previously recognized:

> All of the alleged inconsistencies identified by the plaintiff are implied or indirect conflicts rather than direct conflicts.  Where, as here, a "conflict" is "implied or indirect," the ALJ is permitted to rely upon the vocational expert's testimony, provided that the record reflects an adequate basis for doing so."  *Segovia v. Astrue*, 226 Fed.Appx. 801, 804 (10th Cir. 2007) (unpublished) *(quoting Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000)).

*Kimbrough v. Colvin*, 2013 WL 1015538 *10 (N.D. Okla. Mar. 14, 2013) (unpublished).  In this case, the ALJ asked the VE whether his testimony deviated from the Dictionary of Occupational Titles ("DOT"), and the VE testified that none of his testimony deviated or needed further explanation.  (R. 209).  Based on the VE's response and counsel's failure to raise any objections to the VE's testimony, the ALJ properly relied on the VE's testimony.  *See Poppa v. Astrue*, 569 F.3d 1167, 1173 (10th Cir. 2009).

The ALJ found that Johnson should avoid fine vision and not work with small details. (R. 19).  As explained in *Kimbrough*, the DOT does not define the term "fine vision" but does define "near vision acuity" 2013 WL 1015538 at *10.  In the case at hand, the ALJ described that Johnson's visual limitations were such that she "shouldn't be looking and doing small, tedious tasks with the eyes, like extensive proofreading, working with small nuts and bolts, things of that nature."  (R. 204-05, *see also* 208).  Aware of these limitations, the VE testified that Johnson could perform all of the jobs identified.  (R. 206).  Under these circumstances, it was proper for the ALJ to rely on the VE's testimony.  *Segovia*, 225 Fed.Appx. at 804; *Kimbrough*, 2013 WL 1015538 at *10.

With respect to Johnson's slight limitation in fingering, feeling and grip, the DOT states that the poultry eviscerator job requires significant and constant "handling," occasional

fingering, and no feeling.  Once again, with knowledge of these limitations, the VE testified that

Johnson could perform the jobs identified.  (R. 208-09).

Johnson argues that she cannot perform the job of poultry eviscerator because of

humidity, wetness, and atmospheric conditions.  However, these limitations were not included in

the ALJ's RFC, and he was not required to take them into account.  She also argues that because

the ALJ limited her work environment to "low noise," she would be unable to perform the

poultry eviscerator job in a moderate noise level as well as the bottling line attendant in a loud

noise level.  The ALJ described to the VE in detail, what kind of noise restriction he meant by

this limitation: "I'm not attempting to restrict routine, ordinary business, education, commercial-

type noise. . ." but she should not work around "a lot of high-noise background equipment."  (R.

207).  Aware of these limitations, and without any objection from counsel, the VE testified that

Johnson could perform the jobs identified and the ALJ properly relied on the VE's testimony.

*Segovia*, 225 Fed.Appx. at 804; *Kimbrough*, 2013 WL 1015538 at *10.

Johnson's remaining argument is in regards to the limitation to occasionally reach

overhead with her right arm.  The poultry eviscerator position requires "constant" reaching,

however it does not specify what direction the reaching would take place.  (Westlaw DICOT

#525.687-074).  For purposes of the DOT, "reaching" is defined as extending the hands/arms in

any direction, and does not separately classify reaching overhead.  *Segovia*, 226 Fed.Appx. at

804.  As in S*egovia*, the VE was aware of the limitations on overhead reaching and his testimony

was not contradictory, but served to clarify how the broad categorizations applied to the specifics

of the case.  *Id*.

Because the ALJ found a significant number of jobs that Johnson could perform,

consistent with the RFC finding in his decision and based on the VE's testimony, the undersigned finds no error at Step Five.

## Conclusion

The ALJ's decision is supported by substantial evidence and complies with legal requirements. Based on the foregoing, the undersigned recommends that the decision of the Commissioner denying disability benefits to Claimant be **AFFIRMED.**

## Objections

In accordance with 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72(b), a party may file specific written objections to this Report and Recommendation, but must do so by June 16, 2014. If specific written objections are timely filed, the District Judge assigned to this case will make a *de novo* determination in accordance with Rule 72(b). A party waives District Court review and appellate review by failing to file objections that are timely and sufficiently specific (the "firm waiver rule"). *Moore v. Astrue*, 491 Fed. Appx. 921, 923 (10th Cir. 2012) (unpublished), *citing In re Key Energy Res., Inc.*, 230 F.3d 1197, 1200-01 (10th Cir. 2000).

Dated this 2nd day of June 2014.

Paul J. Cleary
United States Magistrate Judge