IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| SHIRLEY A. JOHNSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 13-CV-288-GKF-PJC |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration, | ) ) ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

Before the court is the Report and Recommendation of United States Magistrate Judge Paul J. Cleary on judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits [Dkt. #21] and the Objections thereto filed by plaintiff, Shirley A. Johnson ("Johnson"). [Dkt. #22]. The Magistrate Judge concluded that the ALJ's decision was supported by substantial evidence and complied with legal requirements, and recommended the Commissioner's decision be affirmed. [Dkt. #21 at 24].

### I. Procedural History

Johnson filed an application for supplemental security income alleging disability beginning August 31, 2010. [R. 15]. The claim was denied initially and on reconsideration. [*Id.*]. An administrative hearing was held before ALJ Gene M. Kelly on April 3, 2012. [R. 171-212]. By decision dated May 22, 2012, the ALJ found that Johnson was not disabled. [R. 15-25]. On March 19, 2013, the Appeals Council denied review. [R. 1-5]. As a result, the decision of the ALJ represents the Commissioner's final decision for purposes of this appeal. 20 C.F.R. §§ 404.981, 416.1481.

## II. Standard of Review

Pursuant to Fed. R. Civ. P. 72(b)(3), "[t]he district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to." However, even under a de novo review of such portions of the Report and Recommendation, this court's review of the Commissioner's decision is limited to a determination of "whether the factual findings are supported by substantial evidence in the record and whether the correct legal standards were applied." *Doyal v. Barnhart*, 331 F.3d 758, 760 (10th Cir. 2003). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* It is more than a scintilla, but less than a preponderance. *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007). The court will "neither reweigh the evidence nor substitute [its] judgment for that of the agency." *White v. Barnhart*, 287 F.3d 903, 905 (10th Cir. 2001).

A claimant for disability benefits bears the burden of proving a disability. 42 U.S.C. § 423(d)(5); 20 C.F.R. §§ 404.1512(a), 416.912(a). Disability is defined under the Social Security Act as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To meet this burden, plaintiff must provide medical evidence of an impairment and the severity of that impairment during the time of her alleged disability. 20 C.F.R. §§ 404.1512(c), 416.912(c). "A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by [an individual's] statement of symptoms." 20 C.F.R. §§ 404.1508, 416.908. A plaintiff is disabled under the Act only if his "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age,

education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988) (setting forth the five steps in detail). The claimant bears the burden of proof at steps one through four. *Williams*, 844 F.2d at 751 n.2. At step one, a determination is made as to whether the claimant is presently engaged in substantial gainful activity. *Id.* at 750. At step two, a determination is made whether the claimant has a medically determinable severe impairment or combination of impairments that significantly limit her ability to do basic work activities. *Id.* at 750-51. At step three a determination is made whether the impairment is equivalent to one of a number of listed impairments that the Commissioner acknowledges are so severe as to preclude substantial gainful activity. *Id.* at 751. If it is, the claimant is entitled to benefits. *Id.* If it is not, the evaluation proceeds to the fourth step, where the claimant must show that the impairment prevents her from performing work she has performed in the past. *Id.* If the claimant is able to perform her previous work, she is not disabled. *Id.* If she is not able to perform her previous work, then the claimant has met her burden of proof, establishing a prima facie case of disability. The evaluation process then proceeds to the fifth and final step: determining whether the claimant has the residual functional capacity ("RFC")[1] to perform other work in the national economy in view of her age, education and work experience. *Id.* The Commissioner bears the burden at step five, and the claimant is entitled to benefits if the Commissioner cannot establish that the claimant retains the capacity "to perform an alternative work activity and that this specific type of job exists in the national economy." *Id.*

---

[1] A claimant's RFC to do work is what the claimant is still functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability. *Williams,* 844 F.2d at 751.

### III. Claimant's Background

Johnson was born November 2, 1960 and was 51 years old at the time of the hearing. [R. 177]. She is married and lives with her husband and adult son and daughter in a rented house. [R. 178]. She completed the tenth grade and was in regular classes most of the time but received learning disabled help in math. [R. 179]. She can read and is able to count change when making purchases at the grocery store. [*Id.*]. At one time she was a certified nurse's aide, but no longer is. [R. 181]. She last worked in July 2009 at a hotel laundry, folding linen. [R. 180]. One day at work her head started hurting and her nose started bleeding. [*Id.*]. She told the supervisor she needed to leave, and the supervisor told her if she left she wouldn't have a job, but she left anyway because she was hurting. [*Id.*] She has worked as a cashier at Church's Chicken and Braum's, and has been a housekeeper at motels. [R. 181].

When asked to list the physical and mental conditions that prevent her from working, Johnson said the middle part of her back, her right arm and right leg hurt. [R. 182-183]. She has high blood pressure, vision and hearing problems, and has to urinate frequently. [R. 183-185].

With respect to her right arm, she testified her wrist hurts all the time; the doctor said she might have carpal tunnel, but she does not wear any type of wrist or splint. [R. 186]. When the ALJ asked her if she would have trouble picking up small items such as poker chips with her thumb and fingers, Johnson stated she might have trouble picking them up, but would probably be able to feel the chips. [R. 187-188]. She has no trouble with her left hand. [R. 187]. Her right arm hurts; she does not know why it hurts, but guesses it is because she has broken it twice. [R. 188]. She has no trouble reaching with her left arm, but has trouble reaching with her right arm. [R. 188, 200-201]. She said she would be able to reach above her head and change a light

bulb with her left hand, but not with her right hand. [R. 189]. She never washes her hair because her daughter does that for her; she can brush her hair with her right hand. [*Id.*].

Johnson testified her right knee hurts all the time and would often swell up; she thought it might have excess fluid in it. [R. 190]. She has not had surgery on the knee, nor have her doctors recommended it. [*Id.*]. She usually wears a wrap on it but was not wearing one that day. [*Id.*]. She uses a walker every now and then. [R. 191]. She does not drive, but instead either takes the bus or has her husband take her places. [*Id.*]. Cold weather makes her whole body ache. [*Id.*].

Johnson testified her back hurts and aches all the time. [R. 191]. The doctors have not told her the reason for her back pain, but told her to keep taking the pain pills and it will stop. [R. 192]. She can bend over and touch her knees but not her toes, and she stated she could not squat and come back up; that "[i]t would take me forever" and "I'd probably fall down." [R. 192]. She can go up and down a flight of stairs, but going down takes her "forever," she gets out of breath and it hurts [R. 193].

Johnson testified that she suffers from headaches "all the time." [R. 189]. Every other day she has a headache and has to lie down in a dark room. [R. 201]. The headaches usually last 15 to 20 minutes, but sometimes they last for hours. [*Id.*]. When she has a headache she lies down in a quiet room and takes a Lortab or an Excedrin if she doesn't have a pain pill. [R. 189-190]. When she has a headache, lights bother her. [R. 190].

Johnson testified she has chest pain "off and on." [R. 199]. Her doctor told her to stop smoking cigarettes, and although she has not stopped smoking altogether, she is smoking less. [*Id.*]. She was given heart pills at the hospital, but the chest pain was not related to her heart. [R. 199-200].

She said she had experienced reduced appetite, but in the previous six months had gained 10 pounds. [R. 198]. She has trouble going to sleep; she goes to bed about 10:30 at night but can't go to sleep until after 2:00 a.m. [R. 198-199]. She said racing thoughts keep her from going to sleep. [R. 199]. On an average night, she sleeps seven hours. [*Id.*]. She does not take naps. [*Id.*].

Johnson takes medication for high blood pressure. [R. 183]. She uses reading glasses and needs regular glasses, but cannot afford them. [R. 184].

Her doctors have told her not to lift more than 10-15 pounds; she can sit 30 or 40 minutes before she needs to stand up, and she can stand for 10-15 minutes before she needs to sit down, but she "ha[s] to be on the run" and "can't stand still." [R. 193-194]. She can walk a block, but has to stop and take her time, because her legs hurt and cramp sometimes. [R. 194].

Johnson feels depressed and anxious, but is not on medication for those conditions, has never been hospitalized for them and is not seeing a counselor. [*Id.*]. She testified the depression stops her from doing things and makes her forgetful. [*Id.*]. However, it has not caused her to get lost in familiar places or to put something on the stove to cook and then forget about it. [*Id.*]. She has no trouble getting along with people. [R. 195-196]. Her medications cause her body "to be feeling funny." [R. 196].

Johnson does dishes every now and then, mops the bathroom floor, makes her bed, does laundry and some cooking and shops. [R. 196-197]. She does not dust furniture, sweep or mop other floors or vacuum. [R. 196]. She watches television in her room. [*Id.*]. She does not read for pleasure. [R. 197]. Her grandchildren are her only visitors. [*Id.*]. She goes to church every now and then. [*Id.*]. She does not belong to any clubs or organizations. [*Id.*]. She has no sports or hobbies, nor does she garden or do yard work. [R. 198].

## IV. Medical Evidence of Record

### A. Treating Physicians

On April 2, 2009, Johnson was transported by ambulance to Hillcrest Medical Center's Emergency Department ("Hillcrest") after the car in which she was a passenger was rear-ended by a Tulsa Transit bus. [R. 96-111]. She complained of head, neck and back pain, but denied loss of consciousness. [R. 105]. She was able to move her head side to side and up and down, and exhibited no neurological deficits, numbness or tingling. [*Id.*]. A spinal x-ray exhibited only degenerative change at the C5-C6 disc level. [R. 104]. Her cervical alignment was anatomic, and no acute cervical fracture or dislocation was identified. [*Id.*]. There was no evidence of soft tissue swelling or acute bony abnormality. [*Id.*]. The attending physician diagnosed her as having acute cervical strain and prescribed Motrin. [R. 98, 100].

On July 29, 2010, Johnson went to the Hillcrest Emergency Department again with a severe sore throat, cough and low grade fever. [R. 113-118]. She was diagnosed with tonsillitis/exudative pharyngitis (an infection of the back of the throat and tonsils), given an injection of dexamethasone, prescribed amoxicillin and Lortab and discharged home. [*Id.*].

On May 11, 2011, Johnson presented at the Oklahoma State University Medical Center ("OSU-MC") emergency room complaining of headache and back pain. [R. 166]. She reported she had experienced intermittent head and low back pain for the last three or four months; the headache had started suddenly and had been worse for the last two weeks. [*Id.*]. She had no fevers or chills, and denied any palliative or provocative factors. [*Id.*]. The pain from the headache was located over her frontal area, and she rated her symptoms as 9/10 in severity. [*Id.*]. She was diagnosed with cephalgia (headache), lumbar strain and hypertension and given

prescriptions for Compazine and Benadryl for her headache, as well as hydrochlorothiazide for hypertension. [R. 167, 170].

On August 10, 2011, Johnson again presented at the OSU-MC emergency room complaining of back pain. [R. 160]. She reported she had experienced intermittent back pain for two months, and it got worse when she fell in the bathtub two days before. [*Id.*]. She described the pain as sharp and non-radiating and rated it a 9/10 in severity. [*Id.*]. She said there were no alleviating or provoking factors, and she denied any numbness, tingling, weakness or paralysis. [*Id.*]. She said she had some urinary frequency and dysuria. [*Id.*]. The attending physician noted that she had bilateral para-spinal muscle tenderness of her thoracolumbar spine. [R. 161]. She was diagnosed with lumbago, prescribed Lortab and advised to follow up with the Family Medicine Clinic. [R. 161-162].

On August 23, 2011, Johnson once again presented at the OSU-MC emergency room complaining of chest pain. [R. 150]. She reported the chest pain had been going on since 9:30 a.m. and came on while she was smoking. [*Id.*]. It was mid-sternal and did not radiate; she rated it a 10/10 in severity and said it hurt to breathe. [*Id.*]. A chest x-ray showed normal cardiac silhouette, no infiltrates and no free air. [R. 151]. EKG readings were within normal limits. [*Id.*]. She was given aspirin and nitroglycerin, and subsequently indicated she was pain free. [*Id.*]. The physician wanted to admit her for cardiac evaluation, but she declined admission, stating she just wanted to have something for her blood pressure and would follow up as an outpatient. [*Id.*]. She was discharged home on hydrochlorothiazide and advised to follow up through her primary care physician. [*Id.*].

After the administrative hearing, and in response to a Social Security Administration subpoena dated April 25, 2012, Margaret A. Stripling, D.O., of Quality Care Medical Center

completed a "Residual Functional Capacity to Do Work Related Activities" form on Johnson.[2] [R. 91-95]. She opined that Johnson could only sit, stand and walk for a total of 14 minutes in an eight-hour day and could not lift or carry any weight at all. [R. 92]. Further, she indicated Johnson could not squat, crawl, climb or reach at all; could only occasionally bend and only occasionally handle or finger with either hand; and could not use her right foot for repetitive movements. [R. 93]. She opined that Johnson should be completely restricted from activities involving unprotected heights, moving machinery, exposure to dust/fumes/gas, driving and vibrations, and moderately restricted from activities involving changes in temperature and humidity. [*Id.*]. She concluded that even with these restrictions, Johnson would be unable to perform work on a sustained and continuing basis due to concentration, not staying on task, anxiety and shortness of breath due to asthma. [*Id.*]. She stated that Johnson "has moderate to severe pain on a daily basis and can't 'sit' or 'stand' for any long period of time," and also has difficulty with ambulation. [R. 94]. She opined that Johnson's medications—Xanax for anxiety and Lortab for pain—might cause drowsiness or sleep and interfere with her concentration. [*Id.*]. In response to the question, "What are the medical findings that support this statement: (Cite objective medical evidence, diagnostic tests, labs, or findings evident upon physical exam.)," she listed various diagnostic tests that should be "schedule[d] ASAP." [R. 95]. As the Magistrate Judge noted, based on differences in handwriting, the form appeared to have been filled out by two different people.

---

[2] At the administrative hearing, counsel for Johnson reminded the ALJ he had requested that the agency issue a subpoena for Dr. Stripling's medical records. [R. 176]. The ALJ acknowledged that the request had been made in February of 2011, but the subpoena had not been issued. [R. 177]. He stated that the subpoena would be issued as soon as possible after the hearing and the doctor would be given 30 days to respond. [*Id.*]. A subpoena seeking all of Dr. Stripling's medical records concerning Johnson was issued on April 25, 2012. [R. 91]. The response to the subpoena was due on May 15, 2012. [*Id.*]. In response to the subpoena, the doctor produced an RFC which was signed May 18, 2012, but not provided to the agency until June 2, 2012—after the ALJ rendered his decision. [R. 92-95]. No other medical records were included. [*Id.*]. However, the Appeals Council considered Dr. Stripling's report and made it a part of the administrative record for this court to consider when evaluating the ALJ's decision for substantial evidence. [R. 3-6].

### B. Agency Examinations/Assessments

Agency consultant Erin Kratz, D.O., examined Johnson on October 23, 2010. [R. 120-129]. Johnson reported she had experienced pain in her back, legs and arms for about four months and that the pain was the result of two car accidents. [R. 121]. Her back pain was constant, sharp and non-radiating, and Johnson rated the pain as 10/10 in severity. [*Id.*]. Movement made the back pain worse and sitting still made it better. [*Id.*]. The pain in her arms was bilateral, but worse in the right arm; it was achy and burning and a 7/10 in severity; dangling her arm made the pain worse and flexing it made the pain a little better. [*Id.*]. The pain in her legs was also bilateral. Every morning when she got out of bed she would fall to the floor because of leg pain; it was in her muscles and felt achy; it was a 9/10 in severity. [*Id.*]. Nothing made the pain better and standing and walking made it worse. [*Id.*]. Johnson reported she was no longer able to drive or perform household chores due to her pain, but was able to bathe and dress herself. [*Id.*]. She stated she had been experiencing non-radiating, sharp chest pain for two months. [R. 127]. The chest pains occurred three to four times per day, lasted 10-15 minutes and were a 9/10 in severity. [*Id.*]. She was taking no medication for the chest pains; she would rest and lie still when they occur. [*Id.*].

During her examination, the doctor noted Johnson's range of motion was limited to 100/150 degrees in both her right and left shoulders in shoulder abduction in supination and shoulder forward elevation. [R. 124]. All other range of motion was within normal limits. [*Id.*]. Dr. Kratz noted pain with movement of upper extremities bilaterally. [R. 122]. Johnson exhibited a significant tremor in her bilateral upper extremities when asked to demonstrate range of motion, but had no tremor at any other time. [*Id.*]. Dr. Kratz reported Johnson's heel and toe walking were equal bilaterally, the range of motion of the spine was without defect and the SLR

(straight-leg-raising) test was negative in seated and supine positions. [*Id.*]. Johnson's gait was stable with a slow speed and a slight limp present but "[n]o abnormality in gait [was] present when claimant [was] observed ambulating in the parking lot," and she did not require the use of assistive devices to ambulate. [*Id.*]. The doctor assessed Johnson as having chronic back, leg and arm pain, hypertension and anxiety. [*Id.*].

On February 7, 2011, agency consultant Timothy Walker, M.D. completed a Residual Functional Capacity Assessment of Johnson. [R. 130-137]. He listed her primary diagnosis as chronic back, leg and arm pain and secondary diagnosis as hypertension. [R. 130]. He opined that she could lift and/or carry 20 pounds occasionally and 10 pounds frequently; stand and/or walk for a total of about six hours in an eight-hour workday; sit about six hours in an eight-hour workday; and perform unlimited push and/or pull movement. [R. 131]. Dr. Walker imposed no postural, manipulative, visual, communicative or environmental limitations. [R. 132-134].

Dr. Walker stated his conclusions were based on Johnson's subjective allegations, records from Hillcrest Medical Center and Dr. Kratz's examination of Johnson. [R. 131]. Specifically, he noted that Dr. Kratz had reported Johnson had pain and a significant tremor in her bilateral upper extremities when asked to demonstrate range of movement, but no tremor at any other time. [R. 131-132]. He stated (incorrectly) that all range of motion in both the upper and lower extremities were within normal limits. [R. 131]. Further, he noted there was no abnormality in gait present when Johnson was observed ambulating in the parking lot, and she did not require the use of assistive devices to ambulate. [R. 132]. He concluded the objective exams did not support the alleged limitations. [*Id.*].

Sharon Dodd, M.D., performed an additional Physical Residual Functional Capacity Assessment of Johnson on April 13, 2011, reviewing records in the file. [R. 138-146]. She

found Johnson could occasionally lift and/or carry up to 50 pounds, frequently lift and/or carry up to 25 pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour workday and perform unlimited push and/or pull movement. [R. 139]. She found no postural, manipulative, communicative or environmental limitations. [R. 140-142]. Regarding visual limitations, she found Johnson's near acuity and far acuity were limited; she lacked the ability to see near or far detail and was unable to read very small print. [R. 141]. Dr. Dodd noted that Johnson had reported difficulty sleeping, but did not give a reason. [R. 143]. She stated that Johnson has no problems with personal care, prepares sandwiches or frozen meals every other day, which takes one hour, and cleans house for 2.5 hours every day. [*Id.*]. Johnson had stated she needs help with housecleaning but did not clarify how much help or with what chores. [*Id.*]. She reported difficulty bending, standing, walking, hearing, and seeing but did not explain how these abilities are affected by her conditions. [*Id.*]. She did not answer the question of how far she can walk, and she did not need an assistive device for walking. [*Id.*].

Dr. Dodd stated that Johnson had full range of motion in her cervical and lumbar spine, although she had pain with range of motion of the lumbar spine and spasm in her lumbar spine. [R. 145]. She had full range of motion for all four extremities except for her shoulders. [*Id.*]. She had no difficulty with personal care. [*Id.*]. Johnson's report that when she gets out of bed she falls straight to the floor because of leg pain were not supported by objective evidence. [*Id.*]. She was not on any pain medication and the chest pain description "sound[ed] atypical." [*Id.*].

Dr. Dodd noted a primary diagnosis of degenerative disc disease of the cervical spine, secondary diagnosis of degenerative disc disease of the lumbar spine, and additional diagnosis of hypertension. [R. 138, 146]. She rated Johnson's RFC as "medium." [R. 146].

## V. The ALJ's Decision

At Step One, the ALJ determined Johnson had not engaged in substantial gainful activity since August 31, 2010, the application date. [R. 17]. At Step Two, he determined the claimant had severe impairments of arthritis in the legs and arms, degenerative disc disease of the cervical spine, vision problems, incontinence, headache, arthritis in the hands and wrists, trouble hearing, depression and anxiety. [*Id.*]. At Step Three, the ALJ found Johnson did not have an impairment or combination of impairments that meets or medically equals the severity of any listed impairment. [*Id.*].

The ALJ found that Johnson has the RFC to perform light work with the following restrictions: She can lift and/or carry 20 pounds occasionally and 10 pounds frequently. [R. 19]. She can stand and/or walk six hours in an eight-hour workday and can sit six hours in an eight-hour workday, all with normal breaks. [*Id.*]. She can occasionally bend, stoop, squat, crouch, kneel or crawl and perform limited climbing. [*Id.*]. She can push/pull with the right upper extremity and operate foot controls with the right lower extremity. [*Id.*]. She can occasionally reach overhead with her right upper extremity and has slight limitation (between frequent and constant) in fingering, feeling and grip. [*Id.*]. Her work environment should have low noise and low light. [*Id.*]. She must avoid fine vision, not working with small details. [*Id.*]. She must avoid cold and must have easy access to restrooms. [*Id.*]. Noting depression and anxiety, the ALJ stated that work must be simple, repetitive and routine, attempting to limit stress and content. [*Id.*]. She must be able to alter positions from standing to sitting at will. [*Id.*]. The ALJ noted her mild to moderate chronic pain, which is of sufficient severity as to be noticeable to her at all times, but stated, "[N]onetheless, she would be able to remain attentive and responsive in a

work setting, and could carry out normal work assignments satisfactorily." [*Id.*]. He also "assum[ed] that this individual takes medication for relief of her symptomatology, but that said medications do not preclude her from functioning at the light level, as restricted, and that the individual would remain reasonably alert to perform required functions presented by [her] work setting." [*Id.*].

At Step Four, the ALJ found that Johnson was not capable of performing any past relevant work. [R. 23]. At Step Five, he found there were jobs in significant numbers in the national economy that Johnson could perform, considering her age, education, work experience and RFC, including poultry cleaner, Dictionary of Occupational Titles (DOT) Code # 525.687.074; bottling line attendant, DOT Code # 920.687.042; and table worker, DOT Code # 739.687.182. [R. 23-24]. Therefore, he concluded that Johnson was not disabled from her alleged onset date of August 31, 2010 through the date of his decision. [R. 24].

On appeal, Johnson argued (1) the ALJ committed multiple errors in evaluating the opinion evidence of record and (2) the Commissioner failed to sustain her burden at Step Five, as Johnson is not capable of performing the jobs identified by the vocational expert. [Dkt. #17]. The Magistrate Judge found the ALJ's decision is supported by substantial evidence and complies with the legal requirements. He recommended the ALJ's decision be affirmed. [Dkt. #21 at 16].

In her Objection, Johnson complains specifically that the ALJ failed to properly evaluate the opinions of Dr. Stripling and of Dr. Walker. [Dkt. #22 at 1-3]. Additionally, she contends that at Step Five the burden shifts to the Commissioner to show by substantial evidence the claimant can perform other work that exists in the national economy, and that there was direct

conflict between the VE's testimony and the DOT jobs she identified with respect to reaching requirements. [*Id.* at 3-4].

## A. ALJ's Evaluation of Opinion Evidence

A non-examining physician's opinion is an acceptable medical source, which the ALJ is entitled to consider. 20 C.F.R. § 404.1513(a)(1). Generally, the opinion of a treating physician is given more weight than that of an examining consultant, and the opinion of a non-examining consultant is given the least weight. *Robinson v. Barnhart*, 366 F.3d 1078, 1084 (10th Cir. 2004). An ALJ must consider all opinion evidence and, if he rejects it, must provide specific legitimate reasons for the rejection. *Doyal v. Barnhart*, 331 F.3d 758, 763-64 (10th Cir. 2003). If an ALJ's RFC determination conflicts with a medical opinion, then the ALJ must explain why the opinion was not adopted. *Sitsler v. Barnhart*, 182 Fed. Appx. 819, 823 (10th Cir. 2006) (unpublished); *Ramirez v. Astrue*, 255 Fed. Appx. 327, 332-33 (10th Cir. 2007).

Johnson argues Dr. Stripling was a treating physician, and therefore the ALJ improperly failed to weigh her opinion. The threshold question, however, is whether Dr. Stripling was in fact a "treating physician" within the meaning of 20 C.F.R. § 416.927(c)(2) (effective Aug. 24, 2012) (formerly 20 C.F.R. § 416.927(d)(2)). That regulation provides, in pertinent part:

> (c) How we weigh medical opinions. Regardless of its source, we will evaluate every medical opinion we receive.
>
> * * *
>
> (2) Treatment relationship. Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.
>
> * * *

15

> (i) Length of the treatment relationship and the frequency of examination. Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion. When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.
>
> (ii) Nature and extent of the treatment relationship. Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

20 C.F.R. § 416.927(c)(2).

The Tenth Circuit has explained:

The treating physician's opinion is given particular weight because of his 'unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 416.927(d)(2). This requires a relationship of both duration and frequency. "The treating physician doctrine is based on the assumption that a medical professional *who has dealt with a claimant and his maladies over a long period of time* will have a deeper insight into the medical condition of the claimant than will a person who has examined a clamant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994) (emphasis added). As the Supreme Court recently observed, "the assumption that the opinions of a treating physician warrant greater credit tha[n] the opinions of [other experts] may make scant sense when, for example, the relationship between the claimant and the treating physician has been of short duration." *Black & Decker Disability Plan v. Nord*, No. 02-469, slip op. at 9, 2003 WL 21210418 (U.S. May 27, 2003). Moreover, a longstanding treatment relationship provides some assurance that the opinion has been formed for purposes of treatment and not simply to facilitate the obtaining of benefits.

A physician's opinion is therefore not entitled to controlling weight on the basis of a fleeting relationship, or merely because the claimant designates the physician as her treating source. Absent an indication that an examining physician presented "the *only* medical evidence submitted pertaining to the relevant time period," the opinion of an examining physician who only saw the claimant once is

not entitled to the sort of deferential treatment accorded to a treating physician's opinion. *Reid v. Chater*, 71 F.3d 372, 374 (10th Cir. 1995) (emphasis added).

*Doyal*, 331 F.3d at 762-63.

Here, the record is devoid of evidence that Dr. Stripling was a treating physician. In response to the agency subpoena, the doctor provided a single RFC form and no other medical records. Indeed, the statement in the RFC that x-rays and blood work should be done suggests that Dr. Stripling had never seen Johnson before. Therefore, the court concurs with the Magistrate Judge's finding that Dr. Stripling's opinions are not the type of longitudinal "treating source" opinions entitled to special weight. *Id.* at 763.

Dr. Stripling's RFC was not provided to the Agency until after the ALJ decision. The Appeals Council is required to consider properly submitted evidence that is new, material and temporally relevant. *Threet v. Barnhart*, 353 F.3d 1185, 1191 (10th Cir. 2003) (citing 20 C.F.R. § 404.970(b)). "If the Appeals Council fails to consider qualifying new evidence, the case should be remanded for further proceedings." *Id.* However, "if . . . the Appeals Council explicitly states that it considered the evidence, there is no error, even if the order denying review includes no further discussion." *Martinez v. Astrue*, 389 Fed. Appx. 866, 868-69 (10th Cir. 2010) (citing *Martinez v. Barnhart*, 444 F.3d 1201, 1207-12 (10th Cir. 2006) (rejecting claimant's argument that the Appeals Council should have specifically discussed the effect of new evidence on the ALJ's decision)). "We take the Appeals Council at its word 'when it declares that it has considered a matter.'" *Martinez*, 389 Fed. Appx. at 869 (quoting *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005)).

In this case, the Appeals Council explicitly stated it had considered the additional evidence, *i.e.*, the RFC form provided by Dr. Stripling. Therefore, the court finds no error in the agency's decision.

17

Johnson also contends the ALJ failed to evaluate Dr. Walker's opinions pursuant to 20 C.F.R. § 404.1527 and if he *had* done so, he would not have relied on the opinions. Specifically, Johnson asserts that Dr. Walker did not examine her; did not have the benefit of review of all the records as his opinion was issued more than a year before the ALJ's decision and was limited to two records; and he misread the note he did review. [Dkt. #22 at 3].

The ALJ is required to "consider all evidence in [the] case record when [he] make[s] a determination or decision whether [claimant is] disabled." 20 C.F.R. § 404.1520(a)(3). "He may not pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence." *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1166 (10th Cir. 2012). However, "[our] limited scope of review precludes this court from reweighing the evidence or substituting our judgment for that of the [Commissioner]." *Flaherty v. Astrue*, 515 F.3d 1067, 1071 (10th Cir. 2007). Where the reviewing court can follow the adjudicator's reasoning in conducting its review and can determine that correct legal standards have been applied, "merely technical omissions in the ALJ's reasoning do not dictate reversal." *Keyes-Zachary*, 695 F.3d at 1166. The ALJ explained that he gave "great weight" to Dr. Walker's opinion because it was based on a review of Johnson's medical records and consultative examinations and was consistent with and supported by the medical evidence in the case. [R. 22]. He gave "some consideration" to Dr. Dodd's later assessment, noting it did not appear to take into consideration the claimant's subjective complaints. [*Id.*]. As the Magistrate Judge pointed out, although Dr. Walker incorrectly stated all range of motion in the upper extremities was within normal limits, he noted the claimant had a significant tremor and experienced pain in her bilateral upper extremities when asked to demonstrate range of motion. And while Dr. Dodd, who completed an RFC assessment of Johnson some two months later, noted the range of motion restriction, she

found Johnson to be capable of performing a medium RFC and imposed less restrictive lift and carry weight restrictions than Dr. Walker had. Moreover, the RFC formulated by the ALJ was more restrictive than either Dr. Walker's or Dr. Dodd's RFC assessments.

Because the record reflects that the ALJ considered Johnson's range of motion impairment, along with all of her other impairments, in his RFC determination, the court will not disturb his determination. *See Flaherty*, 515 F.3d at 1071. Moreover, where evidence does not conflict with the ALJ's RFC determination, the ALJ has a reduced burden for "express analysis." *Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004) ("When the ALJ does not need to reject or weigh evidence unfavorably in order to determine a claimant's RFC, the need for express analysis is weakened."). Here, particularly in light of the fact that the ALJ imposed more restrictions than either consultant identified, the court rejects Johnson's argument that the ALJ improperly weighed the evidence.

### B. Alleged Conflict Between VE's Testimony and DOT Jobs

Johnson asserts the VE's testimony directly conflicts with the DOT job descriptions. She contends she is incapable of performing any of the jobs identified by the VE because all require reaching.[3] And she argues the ALJ failed to adequately question the VE about whether the DOT jobs she identified conflicted with the limitation on overhead reaching.[4]

*Segovia v. Astrue*, 226 Fed. Appx. 801 (10th Cir. 2007), is instructive on this issue. In *Segovia*, the ALJ included the limitation of "only occasional overhead reaching" in his RFC. *Id.* at 802. The vocational expert identified two jobs—ticket-taker and cafeteria attendant—the ALJ found to be consistent with the RFC. *Id.* at 804. Both required "frequent" reaching. *Id.* The

---

[3] The job of Poultry Eviscerator requires constant (two-thirds or more of the time) reaching. DICOT 525.687-074. The jobs of Bottling-Line Attendant and Table Worker require frequent (from one-third to two-thirds of the time) reaching. DICOT 920.687-042; DICOT 739.687-182.

[4] "Reaching" is defined in the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles ("SCO") as "[e]xtending hand(s) and arm(s) in any direction." *See* SCO, Appx. C Physical Demands.

19

Tenth Circuit recognized that given the broad definition of "reaching," it was unclear what kind of reaching the jobs required, but noted that "even a job requiring frequent reaching does not necessarily require more than occasional *overhead* reaching." *Id.* It reasoned that the vocational expert "was aware of Ms. Segovia's limitations on overhead reaching, and he testified . . . that she could perform the jobs he identified." *Id.* It stated, "In these circumstances, the VE's testimony does not conflict with the *DOT* and *SCO* so much as it clarifies how their broad categorizations apply to this specific case." *Id.* And it concluded, "To the extent that there is any implied or indirect conflict between the vocational expert's testimony and the *DOT* in this case, . . . the ALJ may rely upon the vocational expert's testimony provided that the record reflects an adequate basis for doing so." *Id.* (quoting *Carey v. Apfel*, 230 F.3d 131, 146 (5th Cir. 2000)).

Consistent with *Segovia*, the court concludes—contrary to Johnson's assertion—that there is no direct conflict between the VE's testimony and the DOT job descriptions. Furthermore, here, as in *Segovia*, the ALJ's hypothetical included a limitation on overhead reaching. Based on this information, the VE testified that Johnson could perform the three identified jobs. Her testimony was not contradictory, but—as in *Segovia*—served to clarify how the broad categorizations applied to the jobs she identified.

Accordingly, the ALJ's reliance on the VE's testimony was proper.

## VI. Conclusion

For the reasons set forth above, the court overrules Johnson's Objection to the Magistrate Judge's Report and Recommendation. [Dkt. #22]. The Magistrate Judge's Report and Recommendation [Dkt. #21] is accepted and the decision of the Commissioner is affirmed.

ENTERED this 22nd day of July, 2013.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT